412 So.2d 1123 (1982)
Sheldon R. McNEAL and Kay K. McNeal
v.
DIVISION OF STATE POLICE, DEPARTMENT OF PUBLIC SAFETY, State of Louisiana.
No. 14540.
Court of Appeal of Louisiana, First Circuit.
March 2, 1982.
Rehearing Denied April 13, 1982.
Writ Denied May 28, 1982.
*1124 David W. Robinson, Baton Rouge, for Sheldon R. McNeal and Kay K. McNeal.
Gerald L. Walter, Jr., Vincent P. Fornias, Baton Rouge, for Division of State Police, Dept. of Public Safety, State of La.
Kenneth E. Barnette, Baton Rouge, for H Moving & Storage, Inc., Charles R. Gates and Transamerica Ins. Co.
Walter Monsour, Jr., Frank J. Gremillion, Baton Rouge, for City of Baton Rouge.
John Michael Parker, Baton Rouge, for Travelers Ins. Co.
Before COVINGTON, COLE and WATKINS, JJ.
WATKINS, Judge.
This is an action for wrongful death arising from a rear end collision between the front of a large truck and trailer (an 18-wheeler) driven by Charles Gates and owned by H Moving & Storage, Inc., Kileen, Texas, and the rear of a Volkswagen driven by Michael Blane McNeal, son of plaintiffs, who was killed in the accident. Defendants are the Division of State Police, Department of Public Safety, State of Louisiana, and the City of Baton Rouge. An action for wrongful death was simultaneously brought by the same plaintiffs in the United States District Court for the Middle District of Louisiana against H Moving & Storage, Inc., Charles Gates, and their liability insurer. That suit was settled for $80,000.00. Before trial of the present suit, counsel stipulated that in the event defendants should be found liable, judgment would be reduced to account for the share of the previous defendants already released in the federal suit.
After trial, the trial court rendered judgment for defendants, giving oral reasons, dismissing plaintiffs' state court action with prejudice. Plaintiffs perfected a devolutive appeal to this court. We affirm.
The basis of plaintiffs' claim against the State of Louisiana and the City of Baton Rouge is that the police of these governmental entities failed to impound the truck driven by Gates, or otherwise to prevent Gates from driving the truck, although they knew the vehicle had defective air brakes.
The versions of events leading up to the accident given by the state police in testimony in open court differ from the version of those events given by Gates in testimony by deposition. The trial court did not believe Gates' testimony. In that evaluation of Gates' testimony, we find no manifest error. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Canter v. Koehring Company, 283 So.2d 716 (La.1973). Particularly is this the case when we note that Gates' testimony differed in material details from that given by the other witnesses. *1125 Therefore, in reciting the facts, we shall recite the facts as stated by the witnesses other than Gates, except in one particular relating to the instructions Gates testified he received from the State Police, in which we shall give both versions.
On October 3, 1977, Charles Gates was driving an 18-wheeler truck through Baton Rouge on his way to Slidell, Louisiana. He experienced difficulty with his air brakes and was concerned about continuing to operate the truck under these conditions. Since he felt that his boss would not permit him to take the truck off the road unless ordered to do so, he decided to seek assistance from law enforcement officials.
Consequently, he called Troop A headquarters from the site where he had pulled his truck off on the shoulder of Airline Highway (approximately seven or eight miles north of Troop A), and spoke to a Sergeant Baxter. He described the situation to Baxter and suggested that the State Police "redline" or "deadline" the truck, i.e., take it off the road. Although Baxter testified that he could not recall whether or not Gates specifically told him that he was having brake trouble, the record indicated that he did. In any event, Baxter advised him that he could either contact the City Police to get help or bring the truck into Troop A to have it checked.
Gates then flagged down a Baton Rouge City Police car and spoke to Officer Seale. Officer Seale radioed his superior, Sergeant McLendon and told him that Gates' boss wanted Gates to drive the truck, although it had defective brakes. McLendon misunderstood the communication, understanding Seale to say Gates' boss wanted the truck off the road. McLendon instructed Seale to tell Gates all the City Police could do was call a wrecker, which offer Gates refused. Gates said he might drive the truck to Troop A headquarters. Officer Seale and Gates left in their respective vehicles.
McLendon alerted the State Police at Troop A headquarters to the situation. Gates drove the truck down the Airline Highway to the headquarters and parked it on the shoulder across from Troop A. Gates spoke to Sergeant Wisner of the State Police and told him that his brakes lacked air pressure. Trooper Fournet was contacted on the highway to come check the brakes, and he returned to Troop A headquarters. Wisner instructed Gates to drive the truck into the Troop A parking lot, which manuever necessitated making a U-turn in the truck. Fournet inspected the air brakes and said they were bad. Sergeant Wisner then telephoned Gates' boss, Mr. Henderson, in Texas, and told him that the air brakes were bad and that the truck could not be moved. After Wisner talked to Henderson, Gates was permitted to talk to Henderson on another telephone. It is not known what Henderson said to Gates. Fournet relieved Wisner at the desk briefly while Wisner was meeting with a superior officer. When Gates' conversation with his boss was ended, Gates called various repair shops. He then walked up to Fournet and told Fournet, who was at the desk, that he had found someone to fix the truck. In reply to Fournet's inquiry, Gates told him he would have to take it to the repair shop, but that he wanted to talk to his boss again. Since Sergeant Wisner was returning just then, Fournet told Gates to finish this up with Wisner. Fournet did not relate to Wisner what Gates had just told him about the repairs. Fournet then left Troop A headquarters.
Here, the versions differ. The version testified to by Wisner is that Gates simply told Wisner that he was going to have the truck fixed. Gates testified that he found that Cummins Diesel, which was on the Airline Highway about a mile away, would repair the brakes, and that he asked Wisner directions to get there, which Wisner gave. Wisner denied Gates' testimony that he told Gates it would be alright for him to drive the truck to the place where it was to be repaired. We do not believe that the trial court was guilty of manifest error in refusing to believe Gates' testimony. Arceneaux v. Domingue, supra; Canter v. Koehring Company, supra. That view is supported by the testimony of Richard Gele, Service Manager of Cummins Diesel, that *1126 Cummins Diesel did only engine repair on Cummins engines (and Perkins engines as well, to a lesser extent), but did no work on brakes. Gele further testified that he did not recall receiving a call from anyone on the day of the accident requesting brake repairs.
In any event Gates drove his truck back onto Airline Highway, supposedly on his way to have the brakes repaired. After driving a short distance down the road, Gates approached a traffic signal that was red. His air brakes would not work. He tried the mechanical hand brake, but it would not work. He then unsuccessfully tried to put the vehicle into reverse. Gates was driving in the lane closest to the median or neutral ground. He attempted to drive the truck into the ditch to his right. He did not succeed, and plowed into the back of McNeal's Volkswagen dune buggy. Rescue efforts were made, but McNeal died a short time thereafter. Gates testified that his brakes failed as a result of which he was unable to avoid the collision.
Plaintiffs contend that both the City of Baton Rouge and the State Police were guilty of an actionable offense in failing to take the truck off the highway, arguing, basically, first, that permitting Gates to operate the truck upon the highway was actionable negligence, and, second, that release of the vehicle from the custody by first the City Police and then the State Police constituted a basis for strict liability under LSA-C.C. art. 2317.
First, we find that any negligence of the City Police in permitting Gates to operate the truck upon Airline Highway after being flagged down by Gates was too remote from the accident that occurred to constitute an actionable cause of the accident. Many acts and omissions occurred after the truck was not detained by the City Police that broke the chain of causation and that made the negligence, if any, of the City Police recede in time and causation as the force behind the accident. After Gates left Officer Seale, the Baton Rouge city policeman, Gates drove the truck down the Airline Highway to a point opposite Troop A headquarters; he was permitted by the State Police to make a U-turn on Airline Highway to enter the Troop A parking lot; the brakes were inspected and found to be faulty; the State Police made no physical restraint upon the use of the vehicle, and Gates entered Airline Highway and proceeded down the same until the accident occurred. These acts and omissions replace any negligence of the City Police as the cause of the accident and preclude a finding of negligence on the part of the City of Baton Rouge.
As to the theory of plaintiffs that the State Police were guilty of actionable negligence, it appears to this court that the State Police acted reasonably under the circumstances and that they were entirely free of actionable negligence.
As the enforcement arm of the Department of Public Safety, the State Police have a general statutory duty to enforce the provisions of the Highway Regulatory Act, of which LSA-R.S. 32:341 and 343 are parts. LSA-R.S. 32:3. However, this Act does not provide for any specific action to be taken when vehicles are found to be in violation of these provisions. LSA-R.S. 32:392 provides that the State Police may impound vehicles in violation of any provisions of this Act, but does not mandate that such action be taken. LSA-R.S. 32:392, in pertinent part, provides:
"Upon discovery of any vehicle in any manner operated in violation of this Chapter, the vehicle may be impounded forthwith by any state policeman, any authorized representative of the commissioner...."
The statute uses the permissive verb "may", rather than the mandatory verb "shall". It thus authorizes the State Police to impound a defective vehicle, rather than requires that a defective vehicle be impounded. Impoundment of a vehicle in the present day world is a harsh remedy, as it deprives a motorist of his means of movement, and thus should be exercised with due restraint. The question of whether or not all vehicles known by the State Police to be defective should be impounded by them is a question *1127 that addresses itself to the Legislature, not to the courts. Under the present statute, the State Police are merely permitted to impound vehicles that are found to be defective. And that remedy should be applied with due restraint.
Thus, it can be seen that the State Police do not have a specific duty to impound a vehicle it knows to have bad brakes. Obviously, however, the State Police do have a duty to, in general, enforce the Highway Regulatory Act, including LSA-R.S. 32:341 and 343, and to ensure that vehicles known to have faulty brakes do not operate on public roadways. Since no statutory directives or guidelines are given, it would seem that the defendant may enforce these provisions by whatever means it deems appropriate under the circumstances.
In the present case the State Police told Gates, after the brakes were checked by Trooper Fournet and found to be defective, that he was not to drive the truck on the highway. Thus, Gates in driving the truck away from the Troop A parking lot and onto Airline Highway to the scene of the tragic accident was acting in defiance of a State Police order. The only other remedy available to the State Police was physical restraint, either of Gates or of the truck. Restraint of Gates was out of the question as he had committed no traffic offense and had manifested a cooperative attitude to the State Police, having sought them out rather than having been arrested. Gates sought to be ordered by the State Police not to drive the truck on the highway. He was so ordered. He seemed to be alarmed over the possibility that his driving the truck down the highway might kill someone. He stated he would not drive the truck until the brakes were repaired. The State Police thus acted properly and reasonably in not physically restraining Gates. Nor, for the same reasons, having ordered Gates not to drive the truck, were the State Police under a duty to impound the truck.
Gates' statements to Wisner and Fournet could conceivably be taken to mean that Gates would drive the truck away from Troop A headquarters to a repair shop. However, the more reasonable interpretation of his remarks, in the context of the events which had transpired up to that point, is that he would call a wrecker or in any event take no further action until he talked to his boss a second time, which course of action naturally would appear to Fournet to be reasonable since Gates stated he had located a repair shop. When Gates said this, the only possible further action for the State Police, which had already ordered Gates not to drive the truck, was force, applied either to the truck or Gates. It must be remembered that Gates had voluntarily sought out the police because he did not want to drive the truck with the defective brakes on the highway. Since he had taken the truck off the highway, it was reasonable to assume that he would not go back onto the highway until the brakes were repaired. As Gates had manifested a conscientious and cooperative attitude, and had indicated he would not drive the truck until the brakes were repaired, it was not unreasonable for the State Police to believe that impoundment was unnecessary. The trust placed by the State Police in Gates and their failure to use force to detain Gates or the truck were both reasonable and mandated by our tradition of respect for personal freedom. We find the State Police free from negligence.
With respect to strict liability, plaintiffs correctly state that LSA-C.C. art. 2317 imposes strict liability upon the custodian of a defective thing. Loescher v. Parr, 324 So.2d 441 (La.1975). Strict liability may be imposed not only upon a private custodian of a defective thing, but upon a governmental agency if the governmental agency has the defective thing in its custody, under many recent cases, originating in Jones v. City of Baton Rouge, 388 So.2d 737 (La.1980). Plaintiffs contend that the police of the City of Baton Rouge and the State Police were guilty of an actionable offense in releasing from custody the truck which they had first held in custody. Even if we assume that the City or State Police ever had the truck in custody in a legal or *1128 physical sense, which assumption is questionable as neither ever impounded the truck or took any physical action to prevent the truck from being moved, still the basis of the claim of liability is a release of the vehicle from custody, which release quite obviously takes the case outside of art. 2317 coverage, as under art. 2317, the thing must be in one's custody, not, obviously, not be not in one's custody. The fact of the matter is that the truck never having been impounded never fell under State Police custody. Indeed the failure of the State Police to take the truck into its custody or to impound it is the very basis of plaintiffs' complaint. If we were to expand the coverage of art. 2317 to cases in which a thing is not in one's custody, when the court feels it should be in one's custody, we would be expanding art. 2317 far beyond its obvious meaning, substituting our judicial will for the intent of the redactors of the Civil Code. We thus reject appellant's contention that there is art. 2317 strict liability on the part of the City or State.
If we had found an actionable offense had been committed, we would have to pass another hurdle, the recently jurisprudentially adopted "public duty" doctrine. Under that doctrine, a governmental agency is freed from liability for an otherwise actionable offense if the offense is a breach of duty owed the general public, but, conversely not freed from liability if the duty is owed a particular class of individuals. Dufrene v. Guarino, 343 So.2d 1097 (La. App. 4th Cir. 1977), writ denied 343 So.2d 1069 (La.1977); Fusilier v. Russell, 345 So.2d 543 (La.App. 3d Cir. 1977), writ denied 347 So.2d 261 (La.1977); Guillot v. State, 364 So.2d 254 (La.App. 3rd Cir. 1978), writ denied 366 So.2d 576 (La.1979). A recent decision of the Louisiana Supreme Court, Stewart v. Schmieder, 386 So.2d 1351 (1980), found in a case involving the wrongful death of workmen injured when a building collapsed as a result of a faulty or non-existent building inspection, that there had been a breach of a duty owed a particular class of citizens, viz, construction workmen, and that, therefore, it was unnecessary to determine whether the "public duty" doctrine constituted a part of this state's law. However, the result was diametrically opposite the result earlier reached by the Fourth Circuit Court of Appeal in Dufrene v. Guarino, supra, in which the Supreme Court denied writs, which holding under similar factual circumstances found no liability for failure to conduct a proper fire inspection which resulted in bar patrons being burned to death, because the duty breached was a "public duty" owed the general public. We note that by finding a particular class of individuals to have been particularly subject to injury by breach of a "public duty", for example, bar patrons, workmen, pedestrians, tenants, or for that matter users of the public highways, the "public duty" concept can in practical effect be eliminated as an active concept in our law.
However, we need not find whether or not the "public duty" doctrine or its exception in the case of injury to a particular class of individuals applies to the present case, as the "public duty" concept presupposes an otherwise actionable offense.
Here, as we have seen, neither the City of Baton Rouge nor the State was guilty of an actionable offense.
Hence, the judgment of the trial court is affirmed, all costs to be paid by appellants.
AFFIRMED.