EDWARDS, Judge.
This is a suit by Hullinghorst Industries, Inc., to recover the sum of $5,000.00 paid to Kal-Die Casting Corporation under a contract providing for the manufacture of specially designed and cast scaffolding pins; and to recover from Kal-Die the sum of $3,078.96 paid another manufacturer for specially designed cadmium plated scaffold bolts to be used with the pins. The scaffolding pins manufactured by defendant were allegedly defective.
After trial on the merits, the trial court rendered judgment in favor of Hullinghorst Industries in the amount of $8,078.96. From this judgment, Kal-Die has appealed.
Plaintiff, Hullinghorst Industries, Inc., is a domestic corporation engaged in the sec-tionalized metal scaffold rental business in Baton Rouge. The scaffolding maintained by plaintiff is made of tubular bed stand sections which can be stacked vertically and cross-braced to form scaffolds of any desired width and height. In order to join the vertical sections, plaintiff employs special expandable pins, made in England and called “Bleacher” pins, which are inserted into the corner posts of the stacked sections. These pins consist of two longitudinal halves joined midway by a bolt, so designed *1314 that when the bolt is rotated the two halves are driven apart. When the pins are inserted into the corner posts of the vertical scaffolding sections and expanded by means of the bolt, the pins hold the adjacent vertical sections in proper alignment and rigidly stable.
Because of the long delivery schedules involved with the Bleacher pins made in England, plaintiff decided to secure its own Bleacher-type pins and furnish these pins to its customers. To this end, plaintiff contracted with Scottco Tools and Manufacturing Company for the manufacture of the specially designed center bolts at a cost of $3,078.96 and with the defendant for the manufacture of the pin halves. The latter contract is the subject of the present suit.
On April 12,1974, the defendant received a letter from plaintiff seeking a price quotation for the manufacture of the Bleacher-type pin halves. Along with the letter, defendant received one of the halves of an English Bleacher pin. On April 15, 1977, the defendant sent to plaintiff a written price quotation, which listed the price of the dies needed for tooling-up to east the pins and the various prices for different quantities of the castings.
Thereafter, Donald DeHaan, defendant’s president, made a personal trip to plaintiff’s office in Baton Rouge and met with plaintiff’s president, Armand Hullinghorst, and plaintiff’s field salesman, Kenneth Beckley. The testimony regarding what transpired during this meeting is conflicting.
Both Hullinghorst and Beckley testified that DeHaan was given a complete tour of plaintiff’s office, yard and operations; shown a complete Bleacher pin; and shown and told of the purpose of the pins in plaintiff’s business. Additionally, both testified that DeHaan assured them that defendant would make a pin “just like” the English Bleacher pin, both as to physical and dimensional characteristics.
DeHaan denies this. He testified that he was unaware of the intended use of the pins; did not inquire; and never did see the complete pin.
No formal written contract was ever signed by the parties.
In any event, defendant thereafter began the process of tooling-up, which involved fashioning the dies needed to manufacture the pin halves. Plaintiff paid the sum of $5,000.00 for the construction of the dies. Defendant then manufactured and shipped to plaintiff 2,800 sets of castings. Upon receipt of the castings, the specially designed bolts were inserted and the completed pins were furnished to plaintiff’s customers.
Almost immediately, plaintiff began receiving complaints that the pins were breaking whenever the center bolt was tightened. Plaintiff recalled the pins and returned them to the defendant. A later study of the mineral composition of the castings revealed that they differed from the English prototype by having greater porosity and an excess in iron content. This increase in porosity and iron content greatly reduced the strength of the pins and consequently their utility.
Plaintiff refused to pay the invoices for the castings and instituted this suit to recover the amount paid the defendant for tooling-up, and to recover the cost of the bolts rendered useless by the defects in the pins.
The trial judge did not favor us with the reasons underlying his decision. However, the evidence and testimony in the record unquestionably establishes that the pins manufactured by the defendant contained inherent defects which rendered them useless, and that they differed radically from the English prototype with regard to their structural composition.
Kal-Die maintains that any compositional defects should be attributable to plaintiff’s failure to provide detailed mineral specifications and that any loss occasioned by such failure should be borne by the plaintiff.
The trial judge, obviously relying on the testimony of Hullinghorst and Beckley, *1315 placed the responsibility for the failure of the pins with the defendant. The aforementioned testimony clearly establishes that DeHaan, and consequently the defendant, had knowledge of the purpose and intended use of the pins to be manufactured. This knowledge, coupled with the defendant’s superior expertise in metals and castings, should have alerted defendant to the inadequacies of the metal in the pin castings. Accordingly, we find no error in the trial court’s conclusion.
Secondly, Kal-Die contends that, assuming the castings were defective, the trial court erred in awarding plaintiff the cost paid for the dies involved in the tooling-up process. Defendant argues that there were in reality two contracts between the parties: one for the manufacture of the dies and another for the manufacture of the castings themselves. Kal-Die maintains that there are no defects in the dies and that the first contract was fully and satisfactorily performed when plaintiff paid for the dies.
We find no merit in this contention as the evidence in the record convincingly establishes that there was only one contract between the parties. Hullinghorst testified that the sole purpose for his dealings with the defendant was to have his Bleacher pin manufactured. He stated that the dies in the tooling-up process were a necessary step leading to the desired end result, and that he had no use for the dies independent of defendant’s manufacturing operation. We find no support for defendant’s contention in the fact that the dies were paid for separately from the castings. We view this as merely one of the exigencies of the business world and not as an indication of the formation of two separate contracts. Therefore, we reject defendant’s second contention.
Finally, defendant contends that the trial court erred in permitting plaintiff to recover from defendant the cost of the specially designed center bolts used with the castings.
The record is clear that the bolts were manufactured for use with the castings made by defendant. The defendant was undoubtedly aware that such bolts were needed to complete the Bleacher-type pin and that the bolts would have to be specially manufactured. The testimony is uncon-tradicted that the bolts were rendered useless by the defects in the castings and are therefore worthless. Accordingly, we do not find that it was error for the trial court to allow plaintiff to recover from the defendant the cost of the specially designed bolts rendered worthless by the defects in defendant’s castings.
Additionally, as has often been stated by this Court and all the appellate courts of this State, the trial court’s factual findings are entitled to great weight and will not be disturbed on appeal in the absence of a showing of manifest error. Canter v. Koehring Company, 283 So.2d 716 (La.1973). The defendant has failed to show that the trial court committed manifest error in this instance.
For the reasons assigned, the judgment appealed is affirmed at appellant’s cost.
AFFIRMED.