GARRISON, Judge.
This is an appeal from a judgment of the district court granting to petitioner workmen’s compensation benefits in the amount of $95.00 per week, the maximum rate in effect at the time of plaintiff’s first injury on December 25, 1976. From that judgment, the City of New Orleans, as the employer, appeals. Additionally, the petitioner argues on appeal that he is entitled to compensation of $130.00 per week, the rate in effect at the time of petitioner’s third accident, that he is permanently disabled, and that he should be awarded attorney’s fees and penalties.
Donald Rodriguez was employed as a fireman by the City of New Orleans for fifteen and one half years. At the time of the first accident, he had achieved the rank of captain.
On December 25,1976, Captain Rodriguez received a blow to the head while entering a residence through a window, in an attempt to fight the fire within. He was wearing all protective equipment, including a helmet, at the time of the accident. On this occasion, Captain Rodriguez sustained a neck sprain. He was treated by Dr. Raymond F. Kitziger of Battalora, Battalora, Dabezies, and Kitziger, to whom Captain Rodriguez had been recommended by Dr. Jack Ruli, physician for the Fire Department.
While under Dr. Kitziger’s treatment, several x-rays were made. Dr. Kitziger’s analysis of those x-rays as stated in his report did not include a C-5-C-6 displacement.[1] Dr. Kitziger noted “no signs of old or recent bony injury” in the neck. Additionally, Dr. Kitziger noted only “very minor degeneration changes.” He further stated that the disc spaces were “adequately maintained,” and that neutral foramina were patent. Dr. Kitziger diagnosed a “cervical sprain.”[2]
*1008 Captain Rodriguez was absent from active duty for a period of four months. Pursuant to the doctor’s discharge, Rodriguez returned to work on March 13, 1977, but continued to receive prescriptions from Dr. Ruli for Fiorinal, Valium, and Percobarb.
On October 6, 1977, Captain Rodriguez suffered another injury while answering a fire alarm. The property owner adjacent to the fire had been hosing the grass between the two pieces of property to prevent the fire from spreading. When the fire department arrived on the scene, Captain Rodriguez was running with the engine hose, when he slipped upon the wet grass. He tumbled forward and rolled over before regaining his stance. At the time, Captain Rodriguez felt pain in the lower back, right leg, and upper back. After this accident, Captain Rodriguez consulted Dr. Ruli who was still treating the fireman for the previous neck injury. Captain Rodriguez continued working after the October 6th accident.
On December 11, 1977 Captain Rodriguez was again on duty when the third accident occurred. At this time, Captain Rodriguez attempted to lift a 24 foot ladder, while sliding the fire hose from beneath the ladder, in order to prevent the hose from catching fire. At this time, he experienced severe shooting pains in the back and arms. By December 13, he was unable to return to work.
As a result of this accident, Captain Rodriguez consulted Dr. Luis Matta[3] at the suggestion of Dr. Ruli. Dr. Matta’s x-ray analysis of December 20, 1977 reveals the following:
“The patient stated that he injured his neck, mid and lower back on two different occasions, the first one being on October 6, 1977 and the second time on December 11, 1977, while working in the capacity of fire chief in New Orleans, Louisiana, involved in fighting fires.

X-rays consisting of an A.P. lateral and two oblique views of the cervical spine revealed reversed subluxation of C-5 on C-6 bringing about the narrowing of the foramina at this level. There appears to be degenerative changes involving the apophyseal joints at this level. There are no other significant findings. X-rays consisting of an A.P. and lateral views of the thoracic spine mainly revealed minor degenerative changes consisting of anterior spur formation of the vertebral bodies. There is some evidence of ring apo-physitis on the end plates of the lower thoracic vertebras. X-rays consisting of an A.P., lateral, and two oblique views of the lumbosacral spine and a spot lateral view of the lumbosacral joint failed to reveal any fractures, dislocation or sublux-ation.[4] A spina bifida defect of the posterior bony elements of S-l are noted. Intervertebral disc spaces are well maintained. Laminas, pedicles and transverse processes and spinous processes showed no abnormalities.”
“This patient has signs and symptoms of a musculoligamentous strain that has still not responded to treatment. There is some degenerative changes involving the cervical spine that account for some of the symptomatology. The subluxation of C-5 on C-6 in the posterior manner appears to be secondary to an old injury. This brings about a relative narrowing of the foramina and perhaps some extrensic *1009 pressure accompanied with radicular pain into the left upper extremity. Management of this condition should be conservative. He also exhibits what appears to be a strain of the musculature on the right side of the low back and beginning to exhibit some chronicity.” (emphasis added)
Shortly thereafter, Dr. Matta referred the petitioner to Dr. John Jackson, a neurosurgeon. Dr. Jackson’s review of the x-rays resulted in the following observations:
“I reviewed x-rays of the cervical spine which in my opinion reveal a slight dislocation of C-5 posteriorally on C-6. There is also a minor narrowing of the C5-6 disc space with a borderline narrowing of the C4-5 disc space. The posterior offsetting of the C-5 vertebral body may be due to degenerative changes at the C5-6 apohyseal joints bilaterally or it may represent a very slight dislocation of C-5. Examination of the lumbar spine reveals no abnormalities. The x-rays that I studied from your office were dated 12/20/77 and numbered 18259. In order to more thoroughly evaluate the C5-6 possible disc location lateral flexation and extension views were made which reveals a good range of motion on flexation of the cervical spine but there is a rather limited motion on the extension views.
“In conclusion after examining the patient I feel that his symptoms are more than likely arising from the C5-6 disc space which would account for the neck and upper extremity symptoms. I have no evidence to believe that the low back and lower extremity symptoms are due from the degenerative disc disease. Nevertheless, it depends on how much pain Mr. Rodriguez is experiencing as to what should be done next. I believe that a total myelographic evaluation would be the best way to evaluate his condition and feel in view of the symptoms that he has, he should have this done. Also I am somewhat concerned about the C5-6 level since I can not be completely certain that this is due to degenerative changes and it might represent a slight dislocation. I discussed this with Mr. Rodriguez and he may decide to have the myelogram done. After the myelogram definative treatment can be offered or at least a more definite diagnosis made . . . ” (emphasis added)
The above quote is from a report dated February 3, 1978[5] and is an analysis of the x-rays taken by Dr. Matta on December 20, 1977. Later correspondence reveals that Jackson also had x-rays taken on January 24, 1978, but there is no analysis of those x-rays contained in the February 3rd report.
On January 13, 1978, Captain Rodriguez was admitted to Lakeside Hospital by Dr. Jackson. At this time, the petitioner underwent a total myelogram which revealed “a slight defect at the C5-6 level due to the posterior displacement of the inferior edge of the body of C-5.” It further showed widening at the AMI and L5-S1[6], which may be indicative of a disc bulging at this level, (emphasis added)
Some months later on October 11, 1978, Dr. Jackson compared his x-rays taken on January 24, 1978 with Dr. Kitziger’s x-rays taken on January 14, 1977 and concluded that both x-rays show the same C-5 on C-6 displacement. Dr. Jackson further diagnosed the displacement as a cervical fracture.
The last medical evidence offered into the record is that of Dr. Raeburn Llewellyn, a neurosurgeon. Dr. Llewellyn examined Captain Rodriguez on December 7, 1978. He also reviewed all the medical evidence discussed above. Dr. Llewellyn noted two areas of complaint: the neck area and the low-back, bilateral leg area. Dr. Llewellyn concluded that there was both a suspected cervical disc rupture (Tr. p. 48) and a sus *1010 pected herniated disc in the L5-S1 area. (Tr. pp. 50-51)
It is apparent to this court that there are two injuries involved in this case: The C5-C6 neck injury and the L5-S1 low back injury. Although the trial court did not provide us with written or oral reasons for judgment, it is apparent that the judge must have disregarded the second lumbo-sacral injury in order to have awarded to the petitioner workmen’s compensation benefits at the rate in effect at the time of the initial injury.[7] There was no lumbosacral displacement evident immediately after the first accident which involved the neck area, but rather only after the third accident which involved the lower back-leg area, this evidence combined with petitioner’s testimony that he was able to continue working after the second accident, but experienced immediate searing pain after the third accident which prevented him from continuing employment, leads this court to the inevitable conclusion that Captain Rodriguez suffered a lumbosacral injury at the time of the third accident, in addition to the neck injury suffered in the first accident. Accordingly, the trial court was manifestly erroneous in disregarding the second injury in its award of damages. Canter v. Koehring Co., 283 So.2d 716 (1973); Arceneaux v. Dominque, 365 So.2d 1330 (1978).
The next specification of error alleged by petitioner is that the trial court erred in failing to hold that the petitioner is totally and permanently disabled. We agree. All evidence contained within the record indicates the totally and permanently disabling nature of his injuries. These findings are unrefuted. Of special note is Dr. Ruli’s letter of June 1,1978, wherein he stated:
. . Since he (Captain Rodriguez) has such limited motion of the cervical spine associated with proven evidence of a cervical disc, I feel that it would be hazardous for him to return to fire duty. In view of the nature of his condition, I consider him totally and permanently disabled from performing fire duty.”
We conclude that under R.S. 23:1221, Captain Rodriguez is totally and permanently disabled. RachaI v. Highlands Ins. Co., 355 So.2d 1355 (App. 3rd, 1978) and that the trial court was manifestly erroneous in failing to so hold.
The last issue to be confronted by this court is petitioner’s contention that he should be awarded attorney’s fees and penalties due to the City’s termination of benefits on November 4,1978. We do not agree. An employer may not be penalized for taking their case to court on a close factual question. Thompson v. Natchitoches Parish Hospital Service Dist., 335 So.2d 81 (App. 3rd, 1976).
For the reasons discussed above, the judgment of the lower court is affirmed, but amended and recast as follows;
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of plaintiff, Donald Rodriguez, and against the defendant, City of New Orleans, for Workmen’s Compensation benefits at the rate of ONE HUNDRED THIRTY AND NO/100 ($130.00) DOLLARS per week from December 13, 1977 to continue throughout the entire period of his disability, subject to a credit for compensation paid, interest from the date due until paid, and for all costs.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be *1011 judgment herein in favor of plaintiff, Donald, Rodriguez, and against the defendant, City of New Orleans, for Workmen’s Compensation benefits at the rate of NINETY-FIVE AND NO/100 ($95.00) DOLLARS per week from December 25, 1976 to March 13, 1977, subject to a credit for compensation paid, interest from the date due until paid and for all costs.
AFFIRMED, AMENDED AND RECAST.

. “C-5” — Cervical fifth vertebrae
“C-6” — Cervical sixth vertebrae

. Cervical sprain: “A wrenching of a cervical intervertabral joint with injury to the joint attachments, but without displacement of the bony articulation.” (emphasis added) Attorney’s Textbook of Medicine, by Roscoe N. Gray, M.D., Vol. IB, 1| 13.02(2), Matthew Bender Publishing Company (3rd Ed., 1977).

. Dr. Matta’s office is located in the Covington area where Captain Rodriguez was residing. He did not return to Dr. Kitziger because of the distance from his current home.

. Fracture: Destruction of vertebral bones, whether of the body, neutral arch (Pedicles and laminae), articular processes, transverse processes, or the spinous process.
Subluxation: An incomplete displacement of appositional intervertebral articular surfaces, with partial persistence of joint integrity, and
with varying degrees of displacement of adjacent vertebrae from their normal alignment. Dislocation: A complete displacement of ap-positional intervertebral articular surfaces, with an associated displacement of the involved adjacent vertebrae from their normal alignment.
Fracture-dislocation: A combination of fracture and dislocation, with consequent disruption of the normal alignment of the involved cervical vertebrae.
Attorney’s Textbook of Medicine, above.

. This report is of an examination held on January 24, 1978. Oddly enough, this report refers to the one myelogram test in the future tense, whereas the patient’s discharge summary from Lakeside Hospital shows that he was admitted on January 13, 1978 as Dr. Jackson’s patient.

. ‘L5” — Lumbar fifth vertebrae
SI” — Sacral first vertebrae

. We are somewhat perplexed by this judgment. The court awarded the rate in effect at the time of petitioner’s first accident on December 15, 1975. However, the court awarded those benefits from the date of December 13, 1977, or two days after petitioner’s third injury on December 11, 1977. A possibility of two clerical errors exists. Either the trial court intended to award damages as of the 1976 accident, in which case the rate is correct, or else the court intended to award damages as of 1977, in which case the rate awarded is incorrect. Inasmuch as counsel for petitioner filed a pre-trial memorandum seeking to be awarded the later rate of $130.00 per week, we can only conclude that the trial court considered this memorandum and intended to award the lower rate in effect at the time of the first accident. We also note the motion to amend the judgment and the amended judgment contained within the record.