392 So.2d 1119 (1980)
J. C. THORNBURG et al., Plaintiffs-Appellants,
v.
Terry McMILLIN, Indiv. and d/b/a "Hungry Fisherman & Escape Hatch", Defendant-Appellee.
No. 7963.
Court of Appeal of Louisiana, Third Circuit.
December 23, 1980.
Rehearing Denied February 9, 1981.
*1120 Philip A. Letard, Vidalia, for plaintiffs-appellants.
*1121 Lloyd F. Love, Ferriday, for defendant-appellee.
Before GUIDRY, STOKER and DOUCET, JJ.
STOKER, Judge.
Plaintiffs J. C. and Iown Thornburg and Elton and Pansy Jolly filed this suit for injunctive relief and damages. Plaintiffs seek to enjoin defendant, Terry McMillin, from operating a lounge on his property. The basis for this suit is that the operation of this business violated restrictive clauses contained in the act of sale by which defendant acquired his property and that the business constitutes a nuisance. The trial judge rejected plaintiffs' demands and found that no nuisance existed at the time of trial. A judgment was signed ordering the defendant to install a sound monitor in his lounge to insure that the noise level does not exceed 100 db A. The judgment also ordered defendant to install speed bumps for the purpose of controlling traffic entering and leaving his premises.
The issues presented by this appeal are:
(1) May the restrictive clauses contained in the act of sale to defendant's property be enforced against defendant by plaintiffs? This issue is to be determined by the classification of these clauses as either building restrictions, predial servitudes, or personal obligations.
(2) Are the plaintiffs entitled to injunctive relief and damages because a nuisance exists on defendant's property?
The plaintiffs-appellants contend that the trial court erred in holding that: (1) the plaintiffs could not enforce the restrictive clauses because they were personal obligations enforceable only by the defendant's vendor, and (2) plaintiffs were not entitled to injunctive relief or damages because a nuisance did not exist at the time of trial.
Defendant-appellee contends that the restrictive clauses are personal obligations enforceable only by defendant's vendor. Defendant argues that these clauses do not satisfy the requirements for building restrictions under LSA-C.C. arts. 775 through 783. Defendant also maintains the clauses do not satisfy the requirements for predial servitudes under LSA-C.C. arts. 646 through 774.

FACTS
All the parties to this suit own property on Lake Concordia in Concordia Parish. The defendant McMillin operates a restaurant and lounge on his property. McMillin purchased the property on which he built the Hungry Fisherman restaurant from William H. Cuthbertson on June 25, 1973. Defendant acquired the property on which he built the Escape Hatch lounge from Cuthbertson on July 10, 1975. These are adjoining tracts of land.
The plaintiffs Thornburg reside in a home on property to the north of defendant's property. The Thornburgs purchased their property from Cuthbertson on July 1, 1975. The plaintiffs Jolly purchased their property from J. L. Ferrill on June 19, 1972. The Jolly property is north of the Thornburg property. The plaintiffs constructed the homes in which they reside subsequent to the construction of the Hungry Fisherman restaurant but prior to the construction of the Escape Hatch lounge.
At the heart of this litigation are the following restrictive clauses contained in the act of sale conveying the property upon which the Escape Hatch lounge is located.
"SUBJECT ALSO TO the following protective restrictions, which shall be real rights, running with the land, binding upon the Purchaser, his heirs and assigns, for a period of fifteen (15) years from and after this date;
(1) Purchaser agrees and binds and obligates himself, his heirs and assigns to use the premises in a quiet, peaceful and lawful manner compatable with a permanent residential area of current Federal Standards.
(2) Any commercial operations on this property shall be conducted in a manner so as not to disturb adjacent property owners.

*1122 (3) The sale of alcoholic beverages on the premises will be permitted only if in conjunction with the operation of a restaurant as the primary business venture, and in such event, the sale of alcoholic beverages or the operation of any lounge on the premises shall be permitted only within hours when the restaurant kitchen is open and in operation for restaurant business.
(4) No portion of the property herein conveyed shall be used for commercial camping or as the site for a trailer park, commercial apartment or motel."
(Although the restrictive clauses applicable to the Hungry Fisherman restaurant property are not at issue in this case, we note that the act of sale for this property contains restrictive clauses (1) through (3).)
The act of sale for the Thornburg property includes the following restriction:
"Subject also to the restriction that the property shall be used for residential purposes only and shall not be used for any commercial purpose whatsoever at any time within fifteen (15) years after date of this Act of Sale."
No restrictive clauses are contained in the act of sale conveying the Jolly property.
The plaintiffs contend that the defendant violated the restrictive clauses by operating the Escape Hatch lounge separately from the Hungry Fisherman restaurant and selling alcoholic beverages after the restaurant is closed. Plaintiffs complain that the Escape Hatch is not operated in a quiet, peaceful and lawful manner and that continuing disturbances caused by the Escape Hatch deprive plaintiffs of the peaceful use and enjoyment of their properties. Plaintiffs also urge us to hold that the Escape Hatch lounge constitutes a nuisance.
Plaintiff's major complaints are directed at the noise emanating from inside the lounge and the parking areas servicing it. The plaintiffs maintain that the loud music, parking lot noises and patron activity begin in the early evening and last until past 2:00 A.M. thus preventing them from relaxing and sleeping. Increased traffic is another item of nuisance alleged by the plaintiffs, who complain of people turning around in their driveways and cutting across their yards. Plaintiffs also complain that trash and litter from the Escape Hatch is strewn across their property.

I. CLASSIFICATION OF THE RESTRICTIVE CLAUSES.
A. Building Restrictions
The law concerning building restrictions is contained in LSA-C.C. arts. 775 through 783. Article 775 requires that building restrictions must be part of a general plan that is feasible and capable of being preserved. Article 783 provides that when there is doubt as to the existence, validity, or extent of building restrictions, resolution must be made in favor of the unrestricted use of the property. The record in this case reflects that these restrictive clauses were not inserted in the act of sale pursuant to a general plan of development. This is evidenced by the difference in the restrictive clauses contained in the defendant's act of sale and the plaintiffs Thornburgs' act of sale from the vendor Cuthbertson.
B. Predial Servitudes
Restrictions imposed on individual lots without regard to a general plan of development may constitute predial servitudes. LSA-C.C. articles 646 through 774 contain the rules governing predial servitudes. Key elements include the existence of a dominant and a servient estate belonging to different owners. The servitude exists for the benefit of the dominant estate. Article 739 provides that non-apparent servitudes may be acquired by title only. Clauses restricting the use of property for various activities create non-apparent servitudes.
In the instant case the restrictive clauses were inserted in the act of sale by defendant's vendor. In order for these clauses to operate as predial servitudes they must have been established by the owner of the dominant estate for the benefit of his estate or by a person acting in his name or in his behalf. LSA-C.C. arts. 735. The trial *1123 judge in her written reasons for judgment stated that there was no evidence in the record that the vendor Cuthbertson owned any lake properties which could be classified as a dominant estate. Our search of the record reveals the following testimony of defendant McMillin on cross examination at page 409 of the transcript:
"A This was a ... this was an agreement that he had that he put in there about the trailer park because he ... he had intentions of putting a trailer park or possibly something there ... no, he was ... I had that put in because he ... that he couldn't put a restaurant on the property joining me and this was the reason why that was put in. He wanted to put that in because of the... that I couldn't put a trailer park in beside him. Beside my place. That's what I meant. So he put those, that 15-year restriction on this.
Q On your heirs and assigns running with the land?
A About the trailer park, right. Because he has a trailer park and he didn't want me to put a trailer park anywhere on the premises, which I didn't have any intentions of putting one anyway."
This is the only evidence in the record as to the existence of a dominant estate belonging to Cuthbertson. We will assume that this testimony indicates Cuthbertson owned other property which could serve as the dominant estate.
At the time the Thornburgs purchased their property from Cuthbertson he had not yet sold the Escape Hatch property to the defendant. If the restrictive clauses at issue do create a predial servitude, this servitude was not in existence at the time the Thornburgs acquired their property from Cuthbertson. The Thornburgs were not parties to the act containing the restrictive clauses. If these clauses are to operate in their favor this would be the result of a stipulation pour autri. The cardinal rule of contractual interpretation is that the intention of the parties must govern. In our opinion the language of the restrictive clauses does not indicate that Cuthbertson intended these restrictive clauses to benefit the Thornburgs.
Non-apparent servitudes may be acquired by title only. LSA-C.C. arts. 739. The Jollys did not acquire their property from Cuthbertson. Their property is not carved from any of Cuthbertson's property which might have been the dominant estate. They were not parties to the contract containing the restrictive clauses, nor are they in privity with a party to the agreement. Nor do we find that these clauses were intended by Cuthbertson to benefit the Jollys. Thus they may not avail themselves of these clauses through the concept of stipulation pour autri.
The Civil Code provides in Article 730 that any doubt as to the existence, extent or manner of exercise of a predial servitude must be resolved in favor of the servient estate. Our reading of the record does not persuade us that a predial servitude exists to benefit the estates of the plaintiffs Thornburg and Jolly. We affirm the holding of the trial court that the restrictive clauses are personal obligations between the vendor Cuthbertson and defendant McMillin which are unenforceable by the plaintiffs in this case.

II. NUISANCE
LSA-C.C. articles 667 through 669[1] are the foundation for nuisance actions *1124 in our law. These articles detail the obligations of proprietors of property toward one another. Jurisprudence interpreting these articles establishes that "work" includes activity as well as structure under Article 667. Chaney v. Travelers, 259 La. 1, 249 So.2d 181 (1971). Whether or not an activity constitutes a nuisance is a question of fact dependent upon the circumstances of each particular case. Fos v. Thomassie, 26 So.2d 402 (Orl.La.App.1946). The operation of a nightclub is not a nuisance per se in Louisiana. Scott v. LeCompte, 260 So.2d 345 (La. App. 1st Cir. 1972).
Plaintiffs complain principally of noise emanating from the Escape Hatch in the form of loud music and patron activity in the parking lot which prevents them from sleeping and relaxing in their homes.
Under the jurisprudence noise constitutes a nuisance subject to an action for damages and injunction when the noise is excessive, unreasonable in degree, and of such character as to produce actual physical discomfort and annoyance to a person of ordinary sensibilities. The Court in Hobson v. Walker, 41 So.2d 789 (La. App. 2nd Cir. 1949) said:
"It must be conceded that the creation of excessive, unreasonable and disturbing noises, particularly during the night hours, unquestionably constitutes a nuisance, to the abatement of which parties disturbed thereby are entitled. However, it must be borne in mind that noise is not necessarily a nuisance, and a determination of this point can be made only after thorough consideration of all the surrounding circumstances and facts developed in a particular case.
It is impossible to lay down any hard and fast rule inasmuch as numerous factors and elements must be taken into consideration, among which may be briefly noted the character of the locality, the nature of the noises, and the effect thereof upon persons of ordinary sensibilities. The determination of these points rests upon purely factual issues with respect to which the plaintiff in an action of this kind must bear the burden of proof."
The trial judge in her written reasons for judgment reviewed the testimony of each witness and concluded that a nuisance did not exist at the time of trial. Our reading of the record does not reveal that this finding is clearly wrong. We affirm.
We find the testimony of Dr. Charles I. Berlin, an expert witness for the defendant, particularly persuasive on the question of whether or not the noise escaping from the Escape Hatch would be annoying to a person of ordinary sensibilities. Through a discovery motion defendants secured a court order allowing them to measure the sound levels in plaintiffs' bedrooms. These tests were conducted by Dr. Charles I. Berlin and Dr. John K. Cullen, Jr. of the LSU Medical Center in New Orleans. Dr. Berlin is a professor of physiology and otorhinolaryngology and is director of the Kresge Hearing Research Laboratory. Dr. Cullen is assistant director of the laboratory. Dr. Berlin and Dr. Cullen made two trips to measure the sound levels at the Escape Hatch. On the first trip on March 24, 1978, the sound level of the band performing at the Escape Hatch measured between 90 and 100 db A[2] inside the Escape Hatch. The sound level at the property line was 56 db *1125 A. The level in the area of the Jolly driveway was 46 db A. On the second trip on April 11, 1978, a new band was playing at the Escape Hatch. The sound level inside the Escape Hatch measured between 80 and 92 db A. At the time of the second visit several changes had been made at the Escape Hatch. A vent through which noise escaped from the Escape Hatch had been blocked off and a fence had been erected on the property line. Both of these changes contributed to the decreased sound levels. The readings upon the second visit were 26 db A in the Thornburg bedroom and 39 to 40 db A on the porch of the home. The reading in the Jolly bedroom was 20 db A.
Dr. Berlin testified that the Environmental Protection Agency and other researchers have studied the incidents of complaint for various noise levels and found that if the noise level in a bedroom exceeds 48 db A there are unlimited complaints of noise. If the noise level is 33 db A and below, there are no complaints. Dr. Berlin was of the opinion that if the sound level in the Escape Hatch did not exceed 100 db A the sound level in plaintiffs' bedrooms would be about 40 db A, a level which would not be annoying to the average person.
For the foregoing we affirm the judgment of the trial court.
In affirming the trial court we emphasize the following points.
First, it should be noted that we are bound by the well established rule that the findings of fact of the trial court are not to be disturbed on appellate review unless the findings of fact of the trial court are clearly wrong. This standard of appellate review of facts was enunciated in Canter v. Koehring Company, 283 So.2d 716 (La.1973) wherein the Louisiana Supreme Court stated:
"... the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts."
Secondly, we wish to specifically note that the trial court found no "nuisance to exist as of this time." We take the words "as of this time" to mean the date of trial.
Finally, we wish to state that our affirmance in this case should not be taken as an indication by us that music or any recorded sound under amplification shall not constitute a nuisance under any circumstances. It should be pointed out that the noise level tests conducted by defendant's experts were conducted in a situation in which defendant controlled the production and volume of noise at the time those tests were conducted. Plaintiffs produced no experts of their own. The record does not contain any evidence, other than testimonial, as to what the noise level was in plaintiffs' homes at the times of the playing of alleged loud music which provoked plaintiffs to bring this law suit.
The costs of this appeal are assessed equally between the parties, plaintiffs to pay one-half and defendant to pay one-half. The trial court saw fit to divide the costs of the proceedings in the trial court on an equal basis and we think this is fair and equitable.
AFFIRMED.
NOTES
[1] Louisiana Civil Code articles 667-669 provide:

Art. 667. Limitations on use of property. Although a proprietor may do with his estate whatever he pleases, still he can not make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him.
Art. 668. Inconvenience to neighbor. Although one be not at liberty to make any work by which his neighbor's buildings may be damaged, yet every one has the liberty of doing on his own ground whatsoever he pleases, although it should occasion some inconvenience to his neighbor.
Thus he who is not subject to any servitude originating from a particular agreement in that respect, may raise his house as high as he pleases, although by such elevation he should darken the lights of his neighbor's [neighbor's] house, because this act occasions only an inconvenience, but not a real damage.
Art. 669. Regulation of inconvenience. If the works or materials for any manufactory or other operation, cause an inconvenience to those in the same or in the neighboring houses, by diffusing smoke or nauseous smell, and there be no servitude established by which they are regulated, their sufferance must be determined by the rules of the police, or the customs of the place.
[2] The tests conducted by Dr. Berlin measured sound energy in decibels. The measurements were made on the db A scale. This scale measures how much sound is audible to a normal human listener.