457 So.2d 264 (1984)
William Everette BISHOP, Jr., Plaintiff-Appellant,
v.
Ragina Sue Kilpatrick BISHOP, Defendant-Appellee.
No. 83-891.
Court of Appeal of Louisiana, Third Circuit.
October 10, 1984.
Writ Denied November 26, 1984.
*265 Michael H. Davis, Davis & Saybe, Alexandria, for plaintiff-appellant.
Timothy A. Jones, Lafayette, for defendant-appellee.
Before GUIDRY, LABORDE and YELVERTON, JJ.
GUIDRY, Judge.
At issue in this case is the correctness of the trial court judgment which continues in effect a prior award of joint custody.
The parties to this suit were separated by judgment dated September 3, 1982. In that judgment, the trial court awarded the parties joint custody of the child, William E. (Billy) Bishop, III. The judgment ordered that the parents share the custody of the child, each having custody on alternate weeks. The judgment further provided that upon the child's entering school, the mother would have custody during the school term, with the father to have custody on weekends, holidays (with the exception of alternate Christmas holidays), and for two months during the summer.
On February 18, 1983, plaintiff, William Everette Bishop, Jr., filed a petition seeking a divorce on grounds of adultery, and sole custody of the minor child, William E. (Billy) Bishop, III. The mother, Ragina Sue Kilpatrick Bishop, filed an answer and reconventional demand seeking a divorce based on the lapse of six months from the date of the judgment of separation. Her reconventional demand also included a prayer for child support. On March 22, 1983, the father filed a rule to show cause why the mother should not be held in contempt for failure to comply with the custody arrangement previously ordered by the trial court.
The father's custody rule, his rule for contempt, and the mother's rule for child support were all tried on May 2, 1983. The trial court rendered reasons for judgment on May 16, 1983, wherein he (1) decreed the mother in contempt of court for violating the terms of the judgment of separation regarding custody; (2) decreed that the mother was not entitled to child support; and, (3) denied the father's rule for sole custody, continuing the joint custody arrangement as decreed in the judgment of separation. Formal judgment was signed on June 16, 1983.
The father appeals. Ragina neither appealed nor answered the appeal.
Plaintiff's sole specification of error is that the trial court erred in failing to award him sole custody of the child.

FACTS
The plaintiff introduced considerable evidence regarding Mrs. Bishop's fitness as a parent, with particular emphasis placed on her involvement in an extramarital affair. The evidence shows that on a number of occasions during the period of legal separation, Mrs. Bishop's fiance, Ted Domingues, spent the night with her in the apartment she shared with Billy. The child was present on several of these occasions. The *266 frequency of these incidents was somewhat in dispute. Mrs. Bishop characterized them as ocurring "occasionally", and at another point, "very rarely". She stated that she did not recall her fiance ever spending successive nights at her apartment. Mrs. Bishop further testified that the child was never aware that Domingues spent the night at the apartment because Domingues always left before the child awakened in the morning. Although Mrs. Bishop admitted to having sexual intercourse with Domingues, she stated that they never engaged in sexual intercourse when the child was present in the apartment.
Three private investigators testified on behalf of Mr. Bishop. Two of these, Richard and Judy Smith, conducted surveillance on Mrs. Bishop's apartment on January 27, 28 and 29 of 1983. Their testimony established that Domingues spent all three nights at Mrs. Bishop's apartment. The third private investigator, James Gary King, conducted surveillance on Mrs. Bishop's apartment on February 3, 1983. King testified that Mrs. Bishop, her son, and Domingues were present in the apartment until he discontinued the surveillance when all the lights in the apartment were turned off.
In late February, 1983, Mrs. Bishop and her son moved into Domingues' home, and Domingues moved into his parents' home. Mrs. Bishop testified that she had not engaged in sexual intercourse with Domingues after she moved into his home. Richard and Judy Smith conducted surveillance on Domingues' home on March 18, 1983. They testified that Mrs. Bishop and her son spent the night there, but that Domingues did not.
Dr. Milton Rhea, a psychologist who specializes in the treatment of children and adolescents, testified on behalf of Mr. Bishop. Dr. Rhea had examined both Mr. Bishop and his son on two separate occasions. He administered the Minnesota Multiphasic Personality Inventory (M.M.P.I.) to Mr. Bishop. He found that the tests showed Mr. Bishop to have very positive personality traits, including a positive self image, capability, confidence, and ambition. He found Mr. Bishop to have a good capacity to be a good father. Further, the test showed Mr. Bishop to be extremely honest. Dr. Rhea stated that the test revealed no negative personality traits in Mr. Bishop.
Dr. Rhea also testified regarding the conclusions he reached based on his examination of the child. He gave the child the Children's Personality Inventory and the Children's Aperception Test. He found that the child had some emotional disturbance, evidenced by worry, difficulty in sleeping, and bad dreams. He also stated that the child sees his mother as agressive and uncaring. Behavior problems which had recently surfaced in the child were attributed to the child's confusion over the two male authority figures in his life, his father and Domingues. Dr. Rhea found that there was a "competition" for the child, and that Mrs. Bishop and Domingues encourage the child to see Mr. Bishop in a bad light. He further stated that the child told him that he was offered rewards by his mother and Domingues in their efforts to undermine the child's relationship with his father. It should be noted that all the conclusions Dr. Rhea reached regarding Mrs. Bishop and Domingues were based on his examinations and interviews with the child. He never interviewed or examined Mrs. Bishop or Domingues. Dr. Rhea recommended that custody of Billy be placed in Mr. Bishop, with liberal visitation in favor of Mrs. Bishop.
Evidence was also introduced regarding three occasions where Mrs. Bishop refused to allow Mr. Bishop to take the child with him to Houston, Texas, where Mr. Bishop lives, for his regularly scheduled week of custody. These incidents formed the basis for the contempt rule filed by Mr. Bishop. Mrs. Bishop testified that on one of these occasions, she refused to allow Mr. Bishop to exercise his right because the two had agreed to amend the terms of the custody order, and under the terms of their agreement, she was to have custody that week. *267 It should be noted that no other evidence of such an agreement appears in the record.
Mrs. Bishop testified that on another occasion she refused to allow Mr. Bishop to take Billy to Houston because the child was sick, and had a doctor's appointment in Lafayette that week. She testified that on the third occasion, she refused to allow Mr. Bishop to take the child because she feared he would attempt to take the child away from her and not allow her to see him again. According to Mrs. Bishop, Mr. Bishop had threatened several months earlier to remove Billy to California, never to be seen again by Mrs. Bishop. She stated that she had this fear despite the fact that, since the alleged threat, she and Mr. Bishop had been alternating custody on a weekly basis without incident over a period of several months.
Mrs. Bishop also testified that she was physically abused by Mr. Bishop. She further stated that this physical abuse occurred in the presence of the child. She testified to one such incident which allegedly occurred in Houston on May 15, 1982. Mrs. Bishop had driven to Houston to inspect Mr. Bishop's home, being interested in the type of home in which Billy was to live when in Houston. She testified that Mr. Bishop attempted to strangle her while the child looked on, and that he threatened to kill her if she attempted to get sole custody of the child. On cross examination, Mrs. Bishop admitted that she also went out to dinner that evening with Mr. Bishop, had sexual intercourse with him, and stayed overnight with him in Houston. She stated that these things occurred because she was under threats from Mr. Bishop.
Mrs. Bishop also introduced the testimony of a medical expert. Dr. Mario Pruss, an adult and child psychiatrist, examined Mrs. Bishop and the child on two occasions. Dr. Pruss found Mrs. Bishop to be in good emotional condition with no apparent psychological disorders. He wrote in his report that she was a mother of above average qualities. He also found Billy to be in good psychological condition. Dr. Pruss stated that the weekly travel between Lafayette and Houston created a potential for problems. He found the fifty-fifty sharing of custody to be detrimental to Billy's best interest. He recommended that Billy spend the majority of time with Mrs. Bishop, with Mr. Bishop to have visitation rights. Dr. Pruss stated no conclusions with regard to Mr. Bishop, whom he had never examined. The fault he found with the child's situation was related to the custody arrangement itself, not with Mr. Bishop's fitness as a father.
Lisa Nielson also testified on behalf of Mrs. Bishop. She is a teacher and preparative coordinator at the Acadiana Learning School, which Billy attended while in Lafayette. She testified to the love Billy has for his mother, and the care and concern which Ragina has for her son. Ms. Nielson further stated that when Billy returns to the school after a week in Texas, he doesn't seem particularly well adjusted, and he exhibits some behavior problems. She stated that when Billy gets into a fight with other children, he attempts to justify his behavior by claiming that his father instructed him to strike the other children.
The remainder of the testimony was that of friends or relatives of the respective parties. As one would expect, all of these witnesses gave testimony very favorable to the party on whose behalf they appeared. There is nothing in the record to cast doubt on the love each parent has for Billy or the ability of either parent to provide for his material needs.
In his written reasons for judgment, the trial judge reached several factual conclusions, including, (1) Mrs. Bishop was engaged in an adulterous relationship which constituted, or at least approached, concubinage; (2) Mrs. Bishop's testimony, based on both content and her demeanor, was for the most part unworthy of belief; (3) Mrs. Bishop engaged upon a systematic course of undermining Billy's love and respect for his father, and trying to substitute her fiance, Ted Domingues, as the father figure; (4) Mr. Bishop, on the other hand, was totally truthful; and, (5) Mr. Bishop, instead *268 of undermining the mother's position with the child, always encouraged and instructed the child to love and obey his mother.
Our careful review of the record reveals considerable support for all of the trial court's factual conclusions. We find no clear error in his factual findings. Canter v. Koehring Company, 283 So.2d 716 (La. 1973).
Despite the foregoing factual determinations reached by the trial court, he denied Mr. Bishop's rule for sole custody. In his reasons for judgment, he stated:
"Nevertheless, in spite of all of this, the Court does not feel that the best interest of the child would be served by granting full custody at this time to the father. Mrs. Bishop has made some improvement. She should be given a chance to show greater improvement in the future. Therefore, the plaintiff's rule for full custody is denied. The Court feels that the best interest of this young child would be served by continuing the joint custody to which he has been accustomed. The terms of the custody order will changed (sic) automatically by its very wording when the child enters kindergarten. This should take place very shortly as the child is four and one-half years old at the time of this hearing and at that time a more stable schedule for school will commence."
For the reasons which follow, we find that a joint custody arrangement is not in the best interest of the child in the instant case, and that the trial court's judgment continuing joint custody was error.

JOINT CUSTODY
It is axiomatic that the paramount consideration in all child custody matters is the best interest of the child. Bagents v. Bagents, 419 So.2d 460 (La.1982). La.C.C. Art. 146(C) establishes a rebuttable presumption that joint custody is in the best interest of a minor child. A party opposing joint custody, such as plaintiff herein, may rebut the presumption by showing that joint custody is not in the best interest of the child. However, the trial court is vested with wide discretion in deciding custody cases, and his determination is to be disturbed only where there is a manifest abuse of discretion. Ferry v. Ferry, 433 So.2d 359 (La.App. 3rd Cir.1983). At the time this matter was tried, La.C.C. Art. 146 read:
"C. There shall be a rebuttable presumption that joint custody is in the best interest of a minor child unless:
"(1) The parents have agreed to an award of custody to one parent or so agree in open court at a hearing for the purpose of determining the custody of a minor child of the marriage; or
"(2) The court finds that joint custody would not be in the best interest of the child.
"For the purpose of assisting the court in making a determination whether an award of joint custody is appropriate, the court may direct that an investigation be conducted."
La.C.C. Art. 146 was amended by Act 695 of 1983 (effective August 30, 1983). The amended version of the article retains the presumption that joint custody is in the best interest of the child, and enumerates, in La.C.C. Art. 146(C)(2), the following factors which are to be considered in determining whether the presumption has been sufficiently rebutted:
"(2) The presumption in favor of joint custody may be rebutted by a showing that it is not in the best interest of the child, after consideration of evidence introduced with respect to all of the following factors:
(a) The love, affection, and other emotional ties existing between the parties involved and the child.
(b) The capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue the education and raising of the child in his religion or creed, if any.
(c) The capacity and disposition of the parties involved to provide the *269 child with food, clothing, medical care, and other material needs.
(d) The length of time the child has lived in a stable, satisfactory environment, and the desirability of maintaining continuity.
(e) The permanence, as a family unit, of the existing or proposed custodial home or homes.
(f) The moral fitness of the parties involved.
(g) The mental and physical health of the parties involved.
(h) The home, school, and community record of the child.
(i) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
(j) The willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent.
(k) The distance between the respective residences of the parties.
(l) Any other factor considered by the court to be relevant to a particular child custody dispute."
While the foregoing was not made part of La.C.C. Art. 146 until after this matter was tried, the enumerated factors are all clearly relevant to the determination of what is in the best interest of the child. We deem it appropriate to consider these factors in addressing the correctness of the trial court's joint custody order.
The record clearly shows that both Mr. and Mrs. Bishop love Billy deeply, and that each of them is capable of providing for the material, educational, and emotional needs of the child. Likewise, the record shows that Billy loves both of his parents. Thus, with regard to several of the factors delineated in La.C.C. Art. 146(C)(2) (notably a, b, c and g), the record reveals no evidence to rebut the presumption in favor of joint custody. Further, the record shows that both parents can maintain Billy in a permanent family unit (La.C.C. Art. 146(C)(2)(e)). At the time of trial, Billy was 4½ years of age and attending preschool. Thus, there is little evidence with regard to his performance in school and community endeavors. La.C.C. Art. 146(C)(2)(h). Further, Billy was not called as a witness and therefore did not testify to a preference for custodial parent. La.C.C. Art. 146(C)(2)(i).
The remaining factors merit closer consideration.
With regard to Mrs. Bishop's sexual affair with her fiance, we find that such circumstance does not per se render Mrs. Bishop an unfit parent. Greer v. Greer, 346 So.2d 846 (La.App. 1st Cir.1977), writ denied, 349 So.2d 1272 (La.1977); Peters v. Peters, 449 So.2d 1372, docket number 16,192 (La.App. 2d Cir.1984); Lake v. Lake, 452 So.2d 376 (La.App. 3rd Cir.1984).
Of considerably greater importance in the instant case is the distance between the respective residences of the parties. La. C.C. Art. 146(C)(2)(k). As aforementioned, Mrs. Bishop lives in Lafayette while Mr. Bishop lives in Houston. Beginning with the separation judgment dated September 3, 1982, and continuing through the trial of this matter on May 2, 1983, Billy spent alternate weeks in Lafayette and Houston. This plan was continued by the trial court judgment of June 16, 1983, denying the plaintiff's rule for change of custody.
It is noteworthy that both of the experts called to testify recommended a sole custody arrangement with visitation rights in favor of the non-custodial parent. In particular, Dr. Pruss stated that the fifty-fifty custody arrangement whereby Billy was shuttled between Lafayette and Houston on a weekly basis was detrimental to the child's best interest. Dr. Rhea did not focus on the amount of travel the child had to endure in enforcement of the custody arrangement. However, he did find that the emotional disturbance being experienced by the child was related to the custody arrangement, and in particular to his confusion about the two male authority figures. He recommended sole custody in the father, in part because he found Mr. Bishop to be a more stable male authority figure.
*270 We find the opinions of Drs. Pruss and Rhea persuasive insofar as they find the joint custody arrangement in this case to be detrimental to Billy's best interest. The trial court's custody order makes an adjustment in the custody arrangement upon Billy's entering kindergarten. According to the testimony adduced, this was to take place shortly after the trial of this matter. However, the adjusted custody arrangement, in our view, is no less detrimental than the original arrangement. The adjusted order gives Mr. Bishop custody of Billy every weekend during the school term, from 5:00 P.M. on Friday to 6:00 p.m. on Sunday. We of course do not know the manner nor the frequency with which Mr. Bishop has chosen to exercise his custody privilege. It is clear, however, that the custody order authorizes him to pick Billy up in Lafayette every Friday, drive to his home in Houston to spend the weekend there, and to return Billy on Sunday evening. In our view, the constant travel involved in such a practice would be as disruptive, if not more so, than the alternate week arrangement.
Another important factor to be considered is found in La.C.C. Art. 146(C)(2)(j). The trial judge concluded that Mrs. Bishop and her fiance engaged in a systematic course of undermining the love and respect which Billy has for his father and trying to substitute Mrs. Bishop's fiance as the father figure. As aforestated, the trial court's conclusion in this regard has ample support in the record and is not clearly wrong.
Both of the medical experts testified that Billy's living in two households, one in Lafayette and one in Houston, was a source of conflict and confusion. In particular, Billy's confusion is due in part to the fact that he must answer to two male authority figures. In our view, Mrs. Bishop's attempt to substitute her fiance as the father figure can only exacerbate Billy's confusion.
Finally, we consider the importance of the desirability of continuity in a stable and satisfactory environment. La.C.C. Art. 146(C)(2)(d). The record shows that Billy was to enter kindergarten soon after the trial of this matter, in late summer or fall of 1983. If the custody plan was carried out as ordered, Billy will have spent the majority of the last ten months in the custody of his mother. As aforestated, Mr. Bishop had custody every weekend.
The desire for continuity would take on considerably greater importance if the custody plan was indeed stable and satisfactory. We find the opposite to be true. The shuttling of the child between Lafayette and Houston, authorized by the custody order, does not promote stability. The testimony of the medical experts was in accord insofar as it faulted the custody arrangement in part for Billy's developing emotional problems.
Our careful consideration of the foregoing factors convinces us that the presumption in favor of joint custody was rebutted by Mr. Bishop, and that joint custody is not in Billy's best interest. The trial court was clearly wrong in maintaining the joint custody plan.
When joint custody is determined not to be in the best interest of the child, the next preferred custody award is sole custody in favor of either parent. La.C.C. Art. 146(A)(2). Thus, having concluded that joint custody is not in Billy's best interest, we are left to determine which parent should be awarded sole custody of Billy. Under normal circumstances, we would undertake to decide the issue on the basis of the complete record before us. Gonzales v. Xerox Corporation, 320 So.2d 163 (La.1975). We decline to do so in this case, having concluded that, in the instant case, the determination of sole custody is more properly made in the trial court.
Several factors prompt this conclusion. The record shows that Mrs. Bishop and Domingue planned to marry soon after the trial of this matter. In child custody cases where a parent has been engaged in an adulterous relationship, and the record shows that the parent intended to marry the paramour after the trial, the appellate *271 court may choose to remand the matter to the trial court to consider the intended marriage in light of the "reformation" rule. See Atteberry v. Atteberry, 379 So.2d 18 (La.App. 3d Cir.1979), writ granted 381 So.2d 1231 (La.1979) (remanded to trial court to determine whether best interest of children requires custody of mother or of father), writ denied, 386 So.2d 94 (La.1980); Shackleford v. Shackleford, 389 So.2d 825 (La.App. 3d Cir.1980), modified and aff'd, 411 So.2d 736 (La.App. 3d Cir.1982) (child support payment increased). Further, the record indicates that Billy was to start school soon after the trial of this matter. His performance in school and the suitability of the school which he attended are factors which may be important in the custody determination. Finally, because over a year has passed since this matter was tried, there may be other events, other than those cited above, which have occurred in the interim which should be taken into account in determining a proper custody award.
For the above and foregoing reasons, the judgment of the trial court awarding joint custody to the parents is reversed. This matter is remanded to the trial court for a determination of a sole custody award and visitation rights in favor of the non-custodial parent, all in accordance with the best interest of the child.
REVERSED AND REMANDED.