BOWES, Judge.
Plaintiff-appellant, Betty Perez, instituted suit against her own insurer, State Farm Mutual Automobile Insurance Company (hereinafter State Farm) under the uninsured motorist provision of her policy, claiming damages for personal injuries she claimed were sustained as a result of an automobile accident in Baton Rouge, Louisiana, on October 21, 1980.
Prior to trial, it was stipulated that:
1. Mrs. Perez was involved in an automobile accident in Baton Rouge on October 21, 1980, and that the driver of the other vehicle was Gregory Tir-cuit;
2. That plaintiff was involved in a second accident on December 18, 1981, with a vehicle being operated by Rebecca Clark;
3. That State Farm had paid $1,562.43 to appellant for medical expenses claimed to have been necessitated by the October, 1980, accident;
4. That Mrs. Perez’s State Farm policy provided uninsured motorist coverage in the amount of $100,000.00.
Prior to the actual taking of testimony, plaintiff offered, introduced and filed into evidence, without objection, the affidavit of the Department of Public Safety, Office of Motor Vehicles, attesting to the fact that the vehicle being operated by Gregory Tir-cuit was uninsured, which, under La.R.S. 22:1406, is prima facie proof that Gregory Tircuit was uninsured.
Plaintiff alleged that as a result of the October, 1980, accident she sustained the following:
1. Injuries to her neck, which, in turn, caused complaints of pain down to her shoulders, arms and hands;
2. Injuries to her mouth, i.e., the biting down of her teeth, causing a crown to crack, which lead to facial pain and a temporomandibular joint dysfunction and earache; and
3. The aggravation of dormant pre-ex-isting hydrocephalus condition, which necessitated treatment by Dr. Gor-bitz and physicians at Charity Hospital.
Defendant State Farm claimed that the “injuries” suffered by Mrs. Perez as a result of the accident of October, 1980, were less serious in nature, required conservative treatment, and that the subsequent complaints of Mrs. Perez, particularly with regard to her claimed activation of hydrocephalus, developed too late so as to be reasonably related to the October, 1980, accident, and were, therefore, either developed mentally in nature (as was likely the case with the hydrocephalus) or were caused by the second accident of December, 1981 (as was plaintiff’s left hand carpal tunnel syndrome).
*1173 The trial judge gave astute and logical reasons for judgment, finding that the first accident did not cause the onset of the hydrocephalus and he awarded to plaintiff “only those medical expenses directly incurred as a result of the October 21, 1980 accident” in the award of $3,353.00, subject to an appropriate credit for previously-paid expenses, and $15,000.00 in general damages.
The plaintiff appeals that finding, alleging that the district court erred in the above findings and abused its discretion in the amounts awarded.
We affirm.
Medical testimony adduced at trial established that Mrs. Perez’s hydrocephalus was of the congenital type; that the most obvious symptom of the condition is a persistent throbbing headache; and that, as the condition progresses, other symptoms, such as nausea, vomiting, failing vision, drowsiness, semi-coma, and coma, occur, and that, left untreated, the condition results in death.
Three medical doctors and one chiropractor testified at trial. Upon her initial visit to the chiropractor, Dr. Willie Sacks, on December 9, 1981, nine days before her second accident, the appellant filled out a questionnaire stating as her chief complaint: “Intense pain in neck and shoulders and sore and it feels [like] I had a boil in them.” When she returned for her second visit on December 28, 1981, ten days after her second accident, Mrs. Perez was asked to fill out another form because of her accident; at that time, under symptoms, she wrote “Nausea and dizziness, severe headaches, can’t sleep, very irritable, short temper, left hand stays numb, trouble with — trouble with on the left hand [sic].” Dr. Sacks testified that plaintiff had not related any specific “left hand problems” to him before her second accident.
Dr. Richard Warren Levy, an expert in the field of neurosurgery, was called by the defense. Doctor Levy testified thusly:
Q. Doctor, in your opinion, is it likely that someone is going to be able to endure these symptoms you’ve talked about, beginning from the onset of such symptoms for a period of a year and a half or two years?
A. No, I wouldn’t think would be reasonable ...
A hypothesis paralleling the plaintiff’s case was then posed to Dr. Levy, to which he replied:
Based on that information, I think it’s quite apparent that Accident Number I failed to produce symptoms commonly associated with the condition known as hydrocephalus, or advancing hydrocephalus, because the lady did not have any symptoms suggestive of increasing intra-cranial pressure, to-wit: headaches, drowsiness, failing vision, nausea, vomiting, semi-coma, and eventually coma. I think I can state with a reasonable degree of medical certainty, assuming what you’ve asked in your question to be true, that Accident Number 1 of October, 1980, was not the cause of the hydrocephalus found by the neurosurgeon in the spring of 1982.
Dr. Joseph J. Frensilli, an orthopedic surgeon, who was the first doctor to see Mrs. Perez after her October 1980 accident, saw her only once (post-accident), on October 28, 1980. At that time, plaintiff made no complaint of headaches, but rather complained of pain in the posterior cervical spine with numbness to her hands and toes.
The next physician consulted by appellant was another orthopedic surgeon, Dr. Neville J. Reehlmann. Dr. Reehlmann testified that the first time he saw the plaintiff, November 7, 1980, he made no record of any complaint of headache and neither did he record any such complaint on the patient’s seven subsequent office visits. According to Dr. Reehlmann: “I initially saw her complaining of neck pain, arm pain, shoulder pain, and facial pain.”
The only reference that Dr. Reehlmann makes to complaints of headache by Mrs. Perez is in his discharge summary of February 24, 1982 (over two months after the second accident):
*1174 Q. Could you read us your discharge summary?
A. Sure. “Patient was admitted for severe intractible headache and right facial pain which she dates to an automobile accident which happened approximately two years ago. We have on multiple occasions attempted to get this patient to the hospital for complete C-spine examination with no success. Ultimately she was admitted and the results of our entire workup was negative for an ideology for her headache pain, which we still believe to be cervical spine in origin. This was especially permanent because the patient —” well, it should be “This was especially prominent because the patient was related to motion activity, et cet-era. Patient did not have any classical presentations such as headache, intensifying with flexion or blackout periods. She had been seen by multiple specialists in the past and it was thought to be significant — a significant tension component in this lady’s presentation. Ultimately, we determined the presence of bilateral carpal tunnel syndrome and in the off chance that the reflex spasm may have been responsible for some of the headache, left carpal tunnel release was performed. ...” [emphasis added]
Dr. Reehlman did state that in his opinion the accident of October 21, 1980 was the cause in fact of the condition for which he had been treating the plaintiff. However, our reading of the record leaves no doubt that this statement was referring to cervical problems, not hydrocephalus.
The final doctor consulted by appellant was Dr. Carlos Gorbitz, a neurosurgeon, who first saw Mrs. Perez on March 23, 1982, one year and five months after her first accident. Dr. Gorbitz diagnosed Mrs. Perez’s hydrocephalus and operated on her to relieve the condition. Appellant relies heavily on the testimony of Dr. Gorbitz. That testimony states in part:
Q. All right. Did you take a history from the patient?
A. Yes sir.
Q. And what was that history?
A. She told me that approximately a year and a half prior to my consultation she suffered an automobile accident. She developed pain in the cervical spine, headaches. During this interval she had been seen by multiple physicians, E.N.T. specialists, oral surgeon, orthopedic surgeon, she had a temporomandible joint workup, root canals, et cetera. Her pain involved the right side of her head around the right ear and radiating to the angle of the jaw and toward her right eye. All forms of treatment [to] which she was submitted during this year and a half had failed to relieve her condition, [emphasis ours] ...
THE COURT:
It’s true what Mr. Carnahan has stated. There’s conflict in the testimony what I've heard so far today.
MR. MENDOZA:
All right. (To the witness) Dr. Gor-bitz, do you have any opinion as to whether or not the accident on October 21, 1980, was the cause or cause in fact of the asymptomatic hydrocephalus condition for which you treated Mrs. Perez?
THE WITNESS:
I have to assume that we’re dealing here with several unknowns. We know that he [sic] had hydrocephalus which was compensated in equalibri-um, that after the first accident, she developed headaches. That’s all the information that I have — I have to base upon [sic] on that. Whether part of these headaches are related to hydrocephalus, part are related to tension, there’s no way that medically you can prove that. The only thing that I know is that historically from the first accident that she began complaining of headaches, [emphasis ours]
On cross-examination, Dr. Gorbitz testified as follows:
MR. CARNAHAN:
*1175 Q. ... Now I think ultimately what you’re telling us is that based upon her telling you that she had headaches which began in October 1980 and continued up until the time you first saw her one and a half years later, then in your opinion perhaps the pre-existing hydrocephalus was made symptomatic, correct?
A. Yes.
Q. You have no basis or foundation for your opinion as to causation other than what Mrs. Perez told you, correct?
A. That’s correct.
Q. You haven’t, for example, looked at any other medical records, have you?
A. I don’t have any medical records on her.
Q. And you’ve not talked to any of her prior treating physicians, have you?
A. No, sir.
Q. ... Your opinion as to the causation of her problems is ultimately no better or no worse than the reliability of the history that she gave you.
A. That’s correct.
It is clear from Dr. Gorbitz’s testimony that any conclusion he reached regarding the October 1980 accident being related to Mrs. Perez’s hydrocephalus was based solely upon the history that she related to him. Later in his testimony, he stated that when he first saw her she did not tell him of the second accident and that if, in fact, the patient’s headaches first occurred thirteen months after her first accident (as the rest of the record appears to indicate), then they bore no relationship to the accident of October 1980.
The cases are legion which hold that the findings of fact of the trial court are not be be disturbed on review unless they are manifestly erroneous. See Canter v. Koehring Company, 283 So.2d 716 (La.1973) and Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Considering all the testimony and evidence and the excellent reasons for judgment given by the trial judge, we cannot say that he was clearly wrong in his conclusion that Mrs. Perez proved only that she sustained cervical strain and soft tissue injury as a result of her accident on October 21, 1980, and that this accident did not cause the onset of hydrocephalus.
Having reached the foregoing conclusion, we find no abuse of the much discretion allowed the trial court in making the damage awards of $3,353.00 in medical expenses and $15,000.00 in general damages.
Accordingly, the judgment appealed from is affirmed.
AFFIRMED.