563 So.2d 432 (1990)
GULF WIDE TOWING, INC.
v.
ASSOCIATED INSURANCE MANAGERS, INC., et al.
No. 89 CA 0681.
Court of Appeal of Louisiana, First Circuit.
May 30, 1990.
*434 B.J. Rawls, Morgan City, John Haas Weinstein, Opelousas, for Gulf Wide Towing, Inc.
L. Lane Roy, Roy & Hattan, Lafayette, for Intern. Surplus Lines Ins. Co.
Before COVINGTON, C.J., and WATKINS and DOHERTY,[*] JJ.
WATKINS, Judge.
This action is a suit in contract wherein the plaintiff, Gulf Wide Towing, Inc. (Gulf Wide), is seeking coverage under an errors and omissions policy issued to its insurance agent, Associated Insurance Managers, Inc. (AIM), as a result of AIM's negligence in placing inadequate coverage on the plaintiff's vessel, the M/V MISS JULIE MAC. Plaintiff filed suit against AIM; AIM's broker, International Marine and Reinsurance (IMR); and AIM's errors and omissions carrier, International Surplus Lines Insurance Company (ISL). AIM and IMR have filed for bankruptcy, leaving ISL as the only remaining defendant. ISL denied liability under the errors and omissions policy on the grounds that erroneous and/or false answers were given by the insured, AIM, on the application for the policy, thus voiding the policy. The trial court found that the policy insuring AIM against errors and omissions was void. We affirm.

FACTS
In late 1983 Gulf Wide, through its president and sole shareholder, Michael J. Smith, requested AIM to procure quotes on marine hull insurance on several vessels which Gulf Wide and Smith Marine Company[1] owned. In particular, the plaintiff requested hull insurance for the M/V MISS JULIE MAC in the amount of $1,600,000. Vicki Babineaux, one of AIM's agents, contacted Don Simpson of American Commercial Underwriters (ACU), AIM's sister company,[2] requesting that ACU search the market to determine what coverages were available for its customer, Gulf Wide. Thereafter, Don Simpson contacted Don Pritchard, the owner of International Marine and Reinsurance (IMR), in Cocoa Beach, Florida, in order to search the international market for marine insurance. Mr. Pritchard in turn contacted Kasko & Lager in London, England. Kasko & Lager eventually secured several London underwriters to insure the vessels. As a result, Kasko & Lager agreed to bind coverage on the vessels from March 21, 1984, through March 21, 1985. Kasko & Lager issued a cover note to IMR[3] dated April 12, 1984, which stated the types and amounts of coverage *435 on the M/V MISS JULIE MAC. IMR issued a similar cover note to AIM sometime after April 23, 1984; however, AIM had already issued Gulf Wide a policy of insurance on April 3, 1984, apparently based on telexes from Mr. Pritchard to Mr. Simpson on March 21, stating the coverage on the M/V MISS JULIE MAC was $1,280,000, and a telex from Simpson to Pritchard on March 22, 1984, confirming that the coverage was bound on March 21.[4] The policy which AIM issued on April 3, 1984, provided coverage on the M/V MISS JULIE MAC for $1,280,000 and was effective from March 21, 1984, until March 21, 1985. Mr. Smith testified that Gulf Wide did not receive the policy/cover note until the first part of May. He thereafter discovered that the M/V MISS JULIE MAC was insured for only $1,280,000 and immediately contacted Vicki Babineaux concerning the discrepancy. Ms. Babineaux went to Mr. Smith's office to review the cover note, and at that time she contacted Mr. Pritchard concerning the incorrect amount of coverage. Ms. Babineaux testified that Mr. Pritchard verified that the coverage could be increased to $1,600,000, and accordingly she wrote on the cover note that the amount of hull insurance on the M/V MISS JULIE MAC was $1,600,000. AIM never received an endorsement for the increased coverage, nor was any evidence presented confirming the alleged agreement to procure the additional insurance. Approximately a week after Mr. Smith received the cover note, and alerted Ms. Babineaux concerning the incorrect coverage, the M/V MISS JULIE MAC suffered an engine room fire off the coast of Mexico. Thereafter, on July 9, 1984, the vessel sank in the Gulf of Mexico while being towed to the United States for repairs. Gulf Wide notified AIM of the total loss and requested the $1,600,000 hull insurance. AIM later notified Gulf Wide that the coverage was only $1,280,000.
As a result of the error in coverage, ISL was contacted concerning coverage under AIM's errors and omissions policy. ISL had issued a policy insuring AIM for errors and omissions pursuant to an application completed and signed on March 20, 1984, by Robert A. Bodkins, vice-president of AIM, and Don Simpson, president of ACU. AIM used ACU as its broker on this particular application because ISL would not accept applications from any agency unless it was on ISL's computer-producer list. The application was accepted by ISL, and a policy was issued for the term of April 13, 1984, to April 13, 1985.
ISL denied coverage under the policy on the grounds of three exclusions within the policy. The trial court agreed with ISL, finding that the policy was void because AIM falsely answered, with the intent to deceive, a question on the application for insurance and that the false answer materially affected the acceptance of the application by ISL. Plaintiff appeals, assigning the following as errors in the trial court judgment:
1. The trial court erred in finding that ACU/AIM was not the agent of ISL when it purchased the insurance for AIM.
2. The trial court erred in finding that ISL proved that AIM's application for insurance contained false answers, that those answers materially affected ISL's decision to issue the policy, and that there was an intent to deceive the insurer.

*436 3. The trial court erred in relying on the testimony of Cynthia Traynor, underwriter for ISL.
4. The trial court erred in not finding ISL negligent for its failure to investigate AIM's application.

NEGLIGENCE OF AIM
Initially we find that the record as a whole supports the trial court's conclusion that AIM was negligent in procuring coverage on the M/V MISS JULIE MAC. Although Ms. Babineaux testified that Mr. Pritchard verified the increased coverage before the engine room fire in May of 1984, Mr. Pritchard testified that he did not receive a request to procure additional insurance on the M/V MISS JULIE MAC until after the vessel suffered the engine room fire. He further stated that he was unable to procure the additional insurance because of the fire. Mr. Pritchard's testimony and corroborating documentation showed that Mr. Pritchard consistently documented his business transactions; for him to have verified increased coverage over the phone with Ms. Babineaux without first checking with his London underwriters would have been totally inconsistent with his normal business practices.
Notwithstanding the fact that it had not received any further assurances from IMR concerning the increased coverage on the M/V MISS JULIE MAC and the fact that the vessel had suffered engine room damage, AIM issued certificates of insurance to Gulf Wide as late as June 8, 1984, stating that the M/V MISS JULIE MAC was insured for $1,600,000. These assurances from AIM effectively prevented Gulf Wide from seeking insurance coverage from other sources. We find no error in the trial court's finding of negligence on the part of AIM in procuring insurance for the M/V MISS JULIE MAC.

AGENCY
Plaintiff asserts that ACU and AIM were agents of ISL and that the act of an insurance agent in falsely filling out an application form does not bind the innocent insured, nor does it bar recovery. The plaintiff cites Ryan v. Security Industrial Insurance Company, 386 So.2d 939 (La. App. 3d Cir.1980, and Tiner v. Aetna Life Insurance Company, 291 So.2d 774 (La. 1974). We find both of these cases distinguishable from the instant case. In Ryan, the insured's application for life and burial insurance was falsely filled out by the defendant's agent although the insured had provided the correct information. In Tiner, the same mistake occurred when an insurance broker incorrectly filled in the insured's application for health insurance although the insured provided the broker with the correct information. What plaintiff is proposing herein is that AIM was concurrently the insured and the agent of ISL when it applied for insurance, and therefore any incorrect information given by AIM is imputable to ISL. There is no merit to this contention because to follow it would lead to unjust, if not absurd, consequences. Unlike the innocent insureds in Ryan and Tiner, AIM (the insured herein) provided false information to ISL through ISL's alleged agent AIM/ACU. We find no support from the jurisprudence or the record in this case to conclude that AIM was acting as ISL's agent when it applied for its errors and omissions policy.
Furthermore, we do not find that the record supports the finding of an agency relationship between ACU and ISL. An agency relationship is never presumed. "[W]hether a broker in any particular transaction acts as the agent of the insured or of the insurer, is a question of fact dependent on the particular circumstances of the case." Tiner, 291 So.2d at 778 (citations omitted). The evidence presented on this issue revealed that ACU was the producer of the application for AIM's errors and omissions policy because AIM was not on ISL's producer list and therefore AIM could not directly apply for the insurance with ISL. ACU's president signed the application verifying that the information was true, complete, and accurate. ACU received a broker's commission from ISL for the policy. Ms. Traynor, an underwriter for ISL, testified that ACU was not an agent for ISL nor did ACU have the authority *437 to bind ISL on applications. Ms. Traynor further explained that the surplus lines insurance which it sold to AIM could only be issued through a broker who had a surplus broker's license. ACU did not have a surplus broker's license at the time that the ISL application was processed; instead it relied on AIM's surplus broker's license. Apparently neither ACU nor AIM could have procured the insurance on its own, each lacking a necessary requirement. Under these circumstances it does not appear that ACU could in fact solicit business for ISL as ISL's agent. Based on these facts, ACU was not the agent of ISL, but rather a broker acting on behalf of AIM. The evidence presented clearly supports the trial court's finding of no agency relationship between ACU/AIM and ISL.

MATERIAL MISREPRESENTATION WITH INTENT TO DECEIVE
The plaintiff also claims that the trial court erred in finding that AIM's application contained a false answer, that it was material, or that it was made with an intent to deceive. Plaintiff further claims that the trial court erred in relying on the testimony of Cynthia Traynor in establishing the materiality of the false answer.
The Louisiana Supreme Court recently addressed the issue of material misrepresentation with intent to deceive on an insurance application in Darby v. Safeco Ins. Co. of America, 545 So.2d 1022, 1025 (La. 1989). The court stated as follows:
Under the terms of R.S. 22:619A, which sets forth the condition under which an insurer can avoid a liability insurance contract, an oral or written misrepresentation or warranty made by or on behalf of an insured in negotiating an insurance contract cannot be deemed material or void the contract unless made with the intent to deceive. Accordingly, there must be a finding of intent to deceive on the part of the insured in order to defeat coverage. Cousin v. Page, 372 So.2d 1231, 1233 (La.1979); DiGerolamo v. Liberty Mutual Insurance Co., 364 So.2d 939, 941 (La.1978).
The insurer claiming the defense of material misrepresentation in order to avoid coverage bears the burden of proving that the insured misrepresented a material fact and did so with the intent to deceive. Cousin v. Page, supra at 1233. Because of the difficulties inherent in proving that a person acted with the intent to deceive, the courts have lightened somewhat the insured's burden by considering the surrounding circumstances in determining whether the insured knew that representations made to the insurer were false:
'Intent to deceive must be determined from surrounding circumstances indicating the insured's knowledge of the falsity of the representations made in the application and his recognition of the materiality of his misrepresentations, or from circumstances which create a reasonable assumption that the insured recognized the materiality.' Id. (Footnote omitted.)
The application included the following pertinent questions and responses:
19. Has any application for similar insurance on behalf of the applicant or any of its predecessors in business been declined or cancelled, or renewal of such insurance been refused, (X) Yes () No If yes explain: see supplemental information.

* * * * * *
21. Have any claims or suits been made during the last five years against the applicant or any of its predecessors in business, or any other past or present partners, directors, officers, solicitors or employees? (X) Yes () No If yes, attach a statement giving the details and status of each claim including dates, amount of claim, deductibles, payments and open reserves.
* * * * * *
Supplemental Information
Refer to item No. 19 & 21. We had a claim in which there was some $12,000 legal fees involved and we had a $10,000 deductible. The attorney billed us directly and we told the company we would *438 pay them the amount of the deductible, but would not pay the attorney, they then cancelled stating that we did not pay our deduction. We are still ready to pay our deduction when correctly billed per policy contract provisions, however the company has never done so.
The evidence presented at trial established that at least four other lawsuits, involving errors and/or omissions claims against AIM, were pending at the time AIM applied for insurance with ISL. The ISL application was verified by Mr. Bodkins, the vice-president of AIM, and Don Simpson, the president of ACU. Neither Mr. Bodkins nor Mr. Simpson testified at trial.
Ms. Cynthia Traynor also testified concerning the AIM application, although she was not the underwriter who actually processed the application. Ms. Traynor stated that as an underwriter for ISL she reviewed applications which primarily included the background of the applicant, its prior claims history, and prior coverage. She stated that had the AIM application listed the four pending lawsuits in response to the question concerning prior claims, the application would have been rejected by ISL. Her review of the pending lawsuits against AIM revealed that all of the claims dealt with either the nonplacement or incorrect placement of insurance coverage. When asked why the cancellation of AIM's previous errors and omissions policy did not trigger an investigation by ISL, Ms. Traynor replied that because the application explained why the policy had been cancelled, there was no need to investigate further. It was normal business practice and the industry standard to accept the answers given on an application as being correct. She further stated that an investigation is normally prompted only if more than one pending claim is listed on the application, or if the application is incomplete. On cross examination, Ms. Traynor admitted that she did not personally know if the underwriter handling the AIM application checked into anything; however, she stated that the application did not have any notations to that effect. The plaintiff offered no evidence to contradict Ms. Traynor's testimony.
The test to determine the materiality of the misrepresentation made in an insurance application is whether knowledge of the true facts would have influenced the insurer in accepting or rejecting the application or in fixing premiums. Henry v. State Farm Mut. Auto Ins. Co., 465 So.2d 276 (La.App. 3d Cir.1985). A reviewing court must give great weight to the conclusions of the trier of fact, and should not disturb reasonable evaluations of credibility and reasonable inferences of fact in the absence of manifest error. Canter v. Koehring Company, 283 So.2d 716 (La. 1973). Common sense dictates that a material factor in determining whether to insure an insurance agent or broker for errors and omissions would be its previous track record in this regard. In the instant case, Ms. Traynor's testimony confirms the fact that the false answer given by AIM was a material factor in determining whether to insure AIM. Thus, we find no error in the trial court's conclusion that the misrepresentation materially affected ISL's decision to accept AIM's application.
We also find no error in the trial court's reliance upon Ms. Traynor's testimony. Plaintiff claims that because Ms. Traynor was not the underwriter who handled the AIM application, nor was she qualified as an expert, her testimony should be given little, if any, weight. We disagree. The trial court was well within its discretion to rely upon Ms. Traynor's testimony in this regard. She testified that she worked as an underwriter for ISL for two years prior to the date on which the AIM application was received. We find that although Ms. Traynor was not the underwriter who personally handled AIM's application, she was certainly qualified to testify concerning the normal policies and procedures which ISL used in handling applications.
We further find an intent to deceive on the part of AIM. Although we have no direct testimony from the persons who signed the application, we can infer from the surrounding circumstances the insured's *439 knowledge of the falsity of the representations and his recognition of their materiality. Since Robert Bodkins was the vice-president of AIM, a company which had only two officers, it is reasonable to assume that he had knowledge of the pending claims against AIM and that he knew they would be material to ISL in determining whether to insure AIM. We find sufficient evidence to support the trial court's finding of intent to deceive on the part of the insured.

NEGLIGENCE OF ISL
Finally, the plaintiff argues that ISL was negligent in not further investigaging AIM's application. Plaintiff contends that the cancellation of AIM's previous errors and omissions policy should have prompted ISL to inquire into the reason therefor. Ms. Traynor stated that the reason for the cancellation, which AIM provided on its application, was sufficient. Ms. Traynor testified that it was common practice at ISL and accepted industry standard for insurance underwriters to rely on the answers given by the insured. Plaintiff offered no evidence to dispute this fact, therefore failing to prove any duty on the part of ISL.
For the reasons assigned, the trial court judgment is affirmed in all respects. Costs are to be paid by appellant.
AFFIRMED.
NOTES
[*] Judge Lewis S. Doherty, III, is serving pro tem by special appointment by the Louisiana Supreme Court in the absence of Judge Melvin A. Shortess.
[1] Smith Marine Company was also a company in which Mr. Smith had an interest.
[2] Apparently Mr. Harry Simon Hover, Jr., president of AIM, also owned the controlling interest in ACU. Mr. Hover explained that AIM was a commercial retail insurance agency and ACU was a commercial wholesale agency.
[3] According to Mr. Pritchard and Ms. Babineaux, the London market rarely, if ever, issued a policy of insurance; instead they would issue cover notes. The cover note specified the policy form to be used, as well as the exclusions, deductibles and limits of coverage.
[4] Mr. Pritchard testified that initially on February 2, 1984, Mr. Simpson requested $1,280,000 hull insurance for the M/V MISS JULIE MAC. Thereafter, on February 15, Mr. Simpson telexed a request to Mr. Pritchard for $1,000,000 hull value and $600,000 increased value on the hull of the JULIE MAC. Mr. Pritchard informed Mr. Simpson that he could not sell increased value for more than 25% of the hull value, so he contacted Kasko and Lager asking for $1,280,000 hull insurance and $320,000 increased value in order to obtain the full $1,600,000 coverage on the JULIE MAC. Kasko quoted this coverage on March 6, and Mr. Pritchard relayed the information to Mr. Simpson on March 9. Mr. Simpson telephoned Mr. Pritchard on March 12, requesting a lower premium and agreed to reduce the hull insurance to $1,280,000. Thereafter Mr. Pritchard telexed Kasko & Lager, on March 12, requesting the $1,280,000 quote with no increased value. This quote was accepted by Mr. Simpson in a March 22 telex to Mr. Pritchard, confirming that the quoted coverage was bound on March 21.